UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Esmelix Leyva,
    Plaintiff,

v.                                                                                            08-1269

Gerardo Acevedo, et al.,
    Defendants.

MEMORANDUM OPINION AND ORDER

    Before the court are the Defendants, Gerardo Acevedo, Tammy Bennett, Joseph Goodman, Evelyn Johnston, Lois Lindorff (sued as Loris Mathes), R. Martinez and Jerry Mowen's (used as Lt. Mauey) summary judgment motion [81], Defendants, Dr. Shute and Dr. Estaver's summary judgment motion [83], Plaintiff's response [85] and Defendants' reply [91]. Defendants move for summary judgment pursuant to Fed R. Civ. Pro. Rule 56(b).

Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

    "Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(c). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the

existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659. It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. Keri v. Barod of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997).

In responding to a summary judgment motion, the non-moving party may not simply rest upon the allegations contained in the pleading, but must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also DeLuca v. Winer Ind., Inc.*, No. 93-C-6535, 1994 WL 374197, at *2 (N.D. Ill. July 13, 1994). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004). Therefore, the "nonmoving party must present definite, competent evidence to rebut the summary judgment motion." *Kodl v. Bd. Of Educ. Sch. Dist. 45, Villa Park*, No. 05-C-3037, 2006 WL 2192014, at *4 (N.D. Ill. Aug. 1, 2006). "General assertions of fact issues, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden." *Chemical Eng'r Corp. v. Essef Indus.*, 795 F.2d 1565, 1570 (Fed. Cir. 1986) (citations omitted).

Background

Plaintiff, an inmate currently incarcerated with the Illinois Department of Corrections, has filed suit pursuant to 42 U.S.C. §1983 for violations of his civil rights. On May 13, 2009, the court stated in the Merit Review that, "The plaintiff may proceed on his claim under the Eighth Amendment that the defendants were deliberately indifferent to his serious medical needs." Specifically, Plaintiff alleges Defendants were deliberately indifferent to the injuries he sustained on January 5, 2008, when he was assaulted by another inmate and his jaw was fractured. However, Defendants deny they were deliberately indifferent and argue that they are entitled to summary judgment because Plaintiff was under the care of medical experts and there is no evidence they were deliberately indifferent. Further, Defendants argue that they are entitled to qualified immunity because they would not have known that they were violating Plaintiff's rights when they relied on the treating medical professionals to provide Plaintiff with medical care.

Undisputed Material Facts of Defendants, Gerardo Acevedo,
Tammy Bennett, Joseph Goodman, Evelyn Johnston,
Lois Lindorff, R. Martinez and Jerry Mowen's [1]

1. Plaintiff's jaw was fractured during an assault by another inmate on January 5, 2008 at Hill Correctional Center. (Deposition of Plaintiff, pp. 10-11, hereto attached as Exhibit A).
2. After the assault, Plaintiff was provided immediate care by a nurse and taken to the health care unit. (Exhibit A, p. 11).
3. When Plaintiff arrived at the health care unit he was attended to by the nurses and then transferred to the Galesburg Cottage Hospital. (Exhibit A, pp. 11-12).
4. At the outside hospital, Plaintiff was seen by an ER doctor, given X-rays and stayed the night. Further, Dr. Casper, a private physician who deals with dentistry and the jawbone area performed surgery the next day. (Exhibit A, p. 13).
5. Plaintiff's jaw was wired shut by the surgeon. (Exhibit A, pp. 15-16).
6. After surgery, Dr. Casper cleared Plaintiff to return to prison, where he was put in the prison infirmary. (Exhibit A, p. 15).
7. Plaintiff remained in the infirmary at the prison for 12 weeks. (Exhibit A, p. 16).
8. While in the infirmary, Plaintiff was seen by a nurse daily, by Dr. Shute three times and by the dentist Dr. Estaver more than three times. (Exhibit A, p. 18 ¶8-16 and p. 21 ¶14-25).
9. When Plaintiff's jaw was wired shut, he had complaints about the wires poking his gums and Dr. Estaver gave Plaintiff wax to stick on to the edge that was poking his mouth. (Exhibit A, pp. 22-23). Further, more than two or three times wires broke because of brushing and Plaintiff was taken to an outside hospital to see Dr. Bobocheck or Dr. Casper. (Exhibit A, p. 25).
10. The wires were removed from Plaintiff's jaw by an outside doctor after his 12 week stay in the infirmary. (Exhibit A, pp. 27-28).
11. Further, Plaintiff had a second surgery on his jaw by Dr. Swanson. (Exhibit A, pp. 35-6).
12. Plaintiff's claim against Defendant Mathes, a nurse and the prison health care unit administrator, is that she did not direct the dentist, the doctors and the nurses to provide him certain treatment while he was in the health care unit for 12 weeks during 2008. (Exhibit A, p. 50).
13. Plaintiff's claim against Defendant Warden Acevedo, in regards to his medical care, is

---

[1] Exhibits can be found attached to Defendants' Memorandum [82]. Plaintiff's Response does not dispute any of the facts asserted in Defendants' Motion for Summary Judgment. Rather, Plaintiff offers bare allegations, without any factual support, nor any authority contrary to that set out in Defendants' motion. Plaintiff offers bare allegations such as that he "strongly contends that he was not provided with proper medical attention," "maintains with absolute certainty that the Defendants, Dr. R. Shute and Dr. Estaver have systematically and problematically failed to provide the proper medical care," and "repeats and re-alleges the allegations contained in his initial Complaint [and], Motion for Summary Judgment."

that he did not properly supervise the health care unit and that he did not come visit Plaintiff or show enough compassion after his injury. (Exhibit A, pp. 52-53).
14. Plaintiff included Defendant Martinez in this suit because he failed to protect Plaintiff from the inmate who assaulted him. (Exhibit A, p. 57).
15. Plaintiff never asked Defendant Martinez for medical care. (Exhibit A, p. 57).
16. Tammy Bennett is a part of this lawsuit because she failed to protect Plaintiff from assault by an inmate. (Exhibit A, p. 57-58).
17. When Plaintiff made a medical complaint to Defendant Bennett, she ensured that he had access to the health care unit. (Exhibit A, p. 58).
18. Plaintiff wrote grievances to defendant Grievance Counselor Johnston complaining about his medical care and he is suing her because she did not ensure that he had appropriate pain medication or medical care. (Exhibit A, pp. 63 -64).
19. All Plaintiff's grievances to Defendant Johnston started during his stay in the infirmary. (Exhibit A, p. 62 ¶10-14).
20. Plaintiff's claim against Defendant Goodman is that he asked him to see the health care unit to get pain medication and Defendant Goodman told him to make a request to the health care unit. (Exhibit A, p. 67).
21. Plaintiff's claim against Defendant Mowen is that before the assault by another inmate he told Plaintiff to suffer it out and while Plaintiff was in the health care unit Plaintiff made a complaint to Defendant Mowen about his medical treatment, to which Defendant Mowen did nothing. (Exhibit A, p. 69).

Undisputed Material Facts of Dr. Shute and Dr. Estaver[2]

1. Dr. Shute is an employee of Wexford Health Sources, Inc. (hereinafter referred to as "Wexford"), which provides correctional healthcare services. (Richard Shute Dec., ¶3, attached as Exhibit 1).
2. Dr. Shute has been working for Wexford as a Medical Director and/or staff physician since December of 2001. In 2008, Dr. Shute was working as the Traveling Medical Director at Hill Correctional Center. (Shute Dec., ¶¶3-4).
3. Dr. Shute is a licensed physician in the State of Illinois and was so licensed in 2008. (Shute Dec., ¶5).
4. Dr. Shute's medical education includes a Doctor of Medicine degree (1980) from

---

[2]Dr. Shute and Dr. Estaver's exhibits can be found attached to their summary judgment motion [83]. Again Plaintiff's Response does not dispute any of the facts asserted in Defendants' Motion for Summary Judgment. Rather, Plaintiff offers bare allegations, without any factual support, nor any authority contrary to that set out in Defendants' motion. Plaintiff offers bare allegations such as that he "strongly contends that he was not provided with proper medical attention," "maintains with absolute certainty that the Defendants, Dr. R. Shute and Dr. Estaver have systematically and problematically failed to provide the proper medical care," and "repeats and re-alleges the allegations contained in his initial Complaint [and], Motion for Summary Judgment."

Autonomous University of Guadalajara and a Fifth Pathway (1982) from Nassau County Medical Center. (Shute Dec., ¶5).

5. Dr. James Estaver is an employee of Wexford (Estaver Dec., ¶3, attached as Exhibit 2).
6. Dr. Estaver serves as a dentist for that company. In 2008 and 2009, Dr. Estaver was working at Hill Correctional Center. (Estaver Dec., ¶¶3, 6).
7. Dr. Estaver is a licensed dentist in the State of Illinois and was so licensed in 2008 and 2009. (Estaver Dec., ¶4).
8. Dr. Estaver's education includes a Doctor of Dental Medicine degree (1980) from Southwestern University. (Estaver Dec., ¶4).
9. Esmelix Leyva (hereinafter "Leyva") transferred to Hill Correctional Center sometime around July 13-15, 2005. (Leyva Dep., pg. 9 attached hereto asd Exhibit 3); (Shute Dec., ¶6); (Estaver Dec., ¶5)
10. Prior to the incident alleged in this lawsuit, Leyva had been examined and treated at Hill Correctional Center for his medical needs. (Estaver Dec., ¶¶7-12).
11. On July 15, 2005, Leyva was given an initial examination upon his transfer to Hill Correctional Center. (Estaver Dec., ¶8).
12. On October 24, 2006, Leyva had his biennial dental exam. (Estaver Dec., ¶9).
13. On October 25, 2006, Leyva had tooth #17 extracted. (Estaver Dec., ¶10).
14. In 2007, Leyva was fitted for and provided a partial prosthetic, which was delivered on October 23, 2007. (Estaver Dec., ¶¶11-12).
15. On January 5, 2008, while in his cell, Leyva was assaulted by another inmate. A nurse came to treat him in his cell; Leyva was then brought to the Healthcare Unit at Hill. (Leyva Dep., pgs. 10 - 11).
16. Shortly thereafter, Plaintiff was transferred to Galesburg Cottage Hospital. (Leyva Dep., pgs. 11 – 12); (Shute Dec., ¶7); (Estaver Dec., ¶13).
17. At Galesburg Cottage Hospital, Leyva was treated in the emergency room and later seen by Dr. Dan Kaspar, a private practice oral surgeon. (Leyva Dep., pgs. 12 – 14); (Shute Dec., ¶8); (Estaver Dec.; ¶14).
18. Leyva was diagnosed with a fracture of the mandible. (Leyva Dep., pgs. 10 – 13); (Shute Dec., ¶9); (Estaver Dec., ¶15).
19. On January 6, 2008, Leyva underwent surgery at Galesburg Cottage Hospital. Dr. Kaspar performed an open reduction internal fixation of Leyva's fractured jaw and placed intermaxillary fixation arch wires inside his mouth, wiring Leyva's jaw shut. (Shute Dec., ¶10); Estaver Dec., ¶16); (Leyva Dep., pgs. 14 – 15).
20. Neither Dr. Shute nor Dr. Estaver performed surgery on Leyva's jaw. (Shute Dec., ¶29); (Estaver Dec., ¶47).
21. On January 7, 2008, Leyva returned to Hill Correctional Center and was housed in the infirmary for continued recovery. (Leyva Dep., pg. 15); (Shute Dec., ¶11); (Estaver Dec., ¶17).
22. On January 8, 2008, Dr. Shute prescribed a full liquid diet for Leyva. Dr. Shute also prescribed antibiotics and a pain killer, Lortab Elixir, which, in Dr. Shute's medical opinion, based upon his education, experience and training, was an appropriate treatment for Leyva's pain at that time. (Shute Dec., ¶12).
23. Lortab Elixir is a narcotic pain reliever and may be habit forming. (Shute Dec., ¶12).

24. Under the normal protocol at the Hill Correctional Center during January 2008 through February 2009, a physician and/or dentist would enter a medical/dental order and/or write a prescription and return the chart to the nursing staff. (Shute Dec., ¶13); (Estaver Dec., ¶18).
25. The nursing and/or dental staff would then facilitate the order by arranging for the patient to receive the prescribed medication. Under normal protocol, dentists and/or physicians do not administer or distribute prescribed medications. (Shute Dec., ¶14); (Estaver Dec., ¶19).
26. Under the normal protocol of the Hill Correctional Center, an inmate who desires medical or dental treatment completes a request slip. Once the medical or dental department receives the request, an appointment is scheduled. (Shute Dec., ¶30); Estaver Dec., ¶48).
27. Alternatively, a nurse, dental assistant, physician, or other medical or dental staff, could refer an inmate to Dr. Estaver for a dental examination and/or treatment. (Estaver Dec., ¶49).
28. Alternatively, a nurse or other medical or dental staff could refer an inmate to Dr. Shute for an examination and/or treatment. (Shute Dec., ¶31).
29. Also on January 8, 2008, Leyva was seen by Dr. Estaver. He prescribed wax to protect Leyva's lips and cheeks from the wire(s) which had been placed inside his mouth. (Estaver Dec., ¶20); (Leyva Dep., pg. 23).
30. On January 9, 2008, Dr. Estaver again provided wax to protect Leyva's lips and cheeks from being poked by the arch bars. (Estaver Dec., ¶21); (Leyva Dep., pg. 23).
31. On January 12, 2008, Leyva noticed some of the wires in his mouth were coming loose. (Leyva Dep., pgs. 25, 70).
32. Leyva notified a nurse and explained to her what was happening. An oral surgeon was notified and Leyva was taken that day for an emergency medical furlough to see an oral surgeon, Dr. Bruce Bobofchak. (Leyva Dep., pgs 70 – 71); (Estaver Dec., ¶22).
33. On or about January 14, 2008, Dr. Shute ordered that Leyva's prescription of Lortab Elixir be continued for an additional seven days. (Shute Dec., ¶15).
34. On January 15, 2008, Leyva was again seen by Dr. Estaver. (Estaver Dec., ¶23).
35. On January 18, 2008, Dr. Shute entered a medical order to schedule Leyva for a follow-up visit with the oral surgeon. (Shute Dec., ¶18).
36. On January 24, 2008, Dr. Shute again prescribed Lortab Elixir for Leyva's pain for an additional five days. (Shute Dec., ¶17).
37. On January 26, 2008, another one of his wires became loose while Leyva was brushing his teeth. (Leyva Dep., pgs. 25, 72); (Estaver Dec., ¶24).
38. On January 28, 2008, Dr. Estaver treated Leyva for the broken wire by removing the right anterior fixation wire. (Estaver Dec., ¶25); (Leyva Dep., pgs. 71 – 72).
39. Later that same day, January 28, 2008, Plaintiff was sent on a medical furlough to see the oral surgeon, Dr. Bobofchak, who replaced Leyva's arch bar wires. (Leyva Dep., pgs. 25 – 27); (Shute Dec., ¶18); (Estaver Dec., ¶26).
40. On January 29, 2008, Leyva was advised that his prescription for Lortab Elixir was expiring and advised of the potential side effects of narcotics. At that time, a substitute pain medication, Tylenol, was prescribed on a trial basis. (Shute Dec., ¶19).
41. On January 31, 2008, Leyva, who at the time was receiving Tylenol, advised a nurse that

he had a bad night of sleep and asked to speak with a doctor regarding renewal of his pain medication. (Shute Dec., ¶20).

42. That same day, on January 31, 2008, Dr. Shute examined Leyva and prescribed Vistaril and the pain medication Lortab Elixir for another week. (Shute Dec., ¶21).

43. On February 4, 2008, Dr. Shute entered a medical order to schedule Leyva for a two-week follow-up visit with Dr. Bobofchak. (Shute Dec., ¶22).

44. On February 13, 2008, Dr. Estaver treated Leyva after being referred to him by a nurse who advised that Leyva was reporting a problem with one of the wires in his mouth poking his cheek. Dr. Estaver placed wax on the wire and gave Leyva additional wax to use as necessary, which in Dr. Estaver's medical opinion, based upon his education, experience and training, was an appropriate treatment for protruding, rubbing or otherwise poking wires. (Estaver Dec., ¶27).

45. On February 14, 2008, another wire came loose. (Leyva Dep., pg. 72).

46. On February 15, 2008, Leyva was again sent out on a medical furlough to see the oral surgeon, Dr. Bobofchak. (Leyva Dep., pgs. 72 – 73); (Estaver Dec., ¶28).

47. After his return from the oral surgeon, Dr. Estaver ordered additional pain medication, Tylenol as needed, for Leyva. (Estaver Dec., ¶29).

48. On February 21, 2008, Dr. Shute saw and treated Leyva. At that time, he entered a medical order which included that Leyva was to continue on a soft diet and Tylenol for pain control to be used as needed which, in his medical opinion, based upon his education, experience and training, was an appropriate treatment. (Shute Dec., ¶23).

49. On February 28, 2008, Dr. Shute saw and treated Plaintiff for voiding problems and right ankle achiness. Dr. Shute prescribed Cardura and diagnosed Leyva with a right ankle sprain. (Shute Dec., ¶28).

50. On February 29, 2008, Leyva was seen and treated by Dr. Estaver for a lump that Leyva reported was on his tongue. Dr. Estaver noted a gingival ulceration to the area around tooth #26 and concluded it was possible trauma to the gingival mucosa in the area around tooth #26. Dr. Estaver decided he would re-evaluate after the arch bars were removed from Leyva's mouth or at his further request. (Estaver Dec., ¶30).

51. On March 7, 2008, Dr. Kaspar's office called to discuss removal of Leyva's wires/arch bars. Dr. Kaspar's office stated the procedure could be done under local anesthesia. An appointment was tentatively scheduled for March 31, 2008. (Shute Dec., ¶24).

52. On March 13, 2008, Dr. Shute again saw Plaintiff regarding his voiding and urinary complaints. (Shute Dec., ¶28).

53. On March 24, 2008, Dr. Shute entered a medical order to schedule Leyva for removal of the arch bars and wires and to schedule Leyva for a cystoscopy. (Shute Dec., ¶25).

54. On March 31, 2008, Leyva was sent on a medical furlough to oral surgeon Dr. Kaspar to have the arch bars and wires removed from his mouth. (Shute Dec., ¶26); (Estaver Dec., ¶31); (Leyva Dep., pg. 74).

55. On March 31, 2008, after his return from the oral surgeon, Leyva was seen and treated by Dr. Estaver. At that time, Dr. Estaver entered an order that Leyva be put on the list for x-rays. (Estaver Dec., ¶32).

56. After having the arch bars and wires removed, Plaintiff was released from the infirmary at Hill Correctional Center. (Leyva Dep., pg. 30); (Shute Dec., ¶27).

7

57. Leyva is not complaining about anything Dr. Shute did or did not do after his release from the infirmary on March 31, 2008. (Leyva Dep., pg. 38).
58. On April 3, 2008, Plaintiff was seen and treated by Dr. Estaver for a complaint of a blister in his mouth. Dr. Estaver noted slight swelling in the gingival area around tooth #27, and concluded it was possibly related to Leyva's jaw fracture. He did not notice any signs of obvious infection or cysts and decided to follow up, if necessary, upon request from Leyva. (Estaver Dec., ¶33).
59. On May 5, 2008, Plaintiff was sent on a medical furlough to Cottage Hospital for a "green light" procedure. He returned on May 6, 2008. Upon his return, he was prescribed antibiotics and pain medication. (Shute Dec., ¶28).
60. On May 21, 2008, Leyva was again sent out on a medical furlough related to urinary complaints. (Shute Dec., ¶28).
61. On September 26, 2008, dental x-rays of Leyva's mouth were taken. (Estaver Dec., ¶34).
62. On October 17, 2008, Leyva had his biennial dental exam. (Estaver Dec., ¶35).
63. On October 20, 2008, Plaintiff was seen and treated by Dr. Estaver as Leyva was complaining of swelling. Dr. Estaver noted likely pulp death at tooth #27; however, he could not conclusively determine whether the tooth was dead at that time. Dr. Estaver prescribed penicillin and pain medication. Leyva was advised to sign up the following week to be further evaluated. (Estaver Dec., ¶36).
64. On October 24, 2008, a dental impression was taken to prepare a night guard for Leyva. At that time, Leyva reported improvement with the antibiotics. (Estaver Dec., ¶37).
65. On October 28, 2008, x-ray was taken of the right side mandible. (Estaver Dec., ¶38).
66. On November 7, 2008, Leyva's dental night guard was adjusted. (Estaver Dec., ¶39).
67. On January 2, 2009, Leyva was seen at the dental department for complaints of swelling. He was prescribed penicillin and pain medication, and advised to sign up for further evaluation on January 5, 2009. (Estaver Dec., ¶40).
68. On January 5, 2009, Leyva was seen and treated by Dr. Estaver for dental pain. Dr. Estaver concluded that Leyva's pain might be related to regeneration of the mandible nerve and prescribed pain medication. (Estaver Dec., ¶41).
69. On January 9, 2009, Leyva was prescribed additional pain medication. (Estaver Dec., ¶42).
70. On January 10, 2009, Leyva was seen by a physician who was treating Leyva for complaints of jaw pain. He, too, prescribed pain medication. (Estaver Dec., ¶43).
71. On January 16, 2009, Leyva was not brought over to the dental department from segregation for evaluation. The appointment was rescheduled. (Estaver Dec., ¶44).
72. On February 6, 2009, Leyva was again rescheduled as he continued to be in segregation. (Estaver Dec., ¶45).
73. On February 24, 2009, Leyva was seen and treated by Dr. Estaver. X-rays were taken which showed that the area around tooth #27 appeared to be at the previous fracture line. There were no signs of swelling, infection, or traumatic occlusion. Dr. Estaver ordered a reevaluation of the area around tooth #27 and prescribed Motrin for pain. (Estaver Dec., ¶46).
74. On or about February 25, 2009, Plaintiff was transferred from Hill Correctional Center to Pinckneyville Correctional Center. (Leyva Dep., pgs. 9 – 10, 36 – 37); (Estaver Dec., ¶5).

75. Leyva is not complaining about anything Dr. Estaver did or did not do after his transfer. (Plaintiff's Response to Defendant Estaver's Interrogatory No. 2, attached hereto as Exhibit 4).
76. Dr. Estaver responded to Leyva's requests for dental care and all referrals of which he was notified. When Leyva reported pain, he prescribed what, in his medical opinion, based upon his education, experience and training, was an appropriate treatment. (Estaver Dec., ¶50).
77. Likewise, Dr. Shute responded to Leyva's requests for medical care and all referrals of which he was notified. Dr. Shute prescribed what, in his medical opinion, based upon his education, experience and training, was an appropriate treatment on each professional encounter. (Shute Dec., ¶32).
78. Dr. Estaver provided Leyva with dental care and treatment for his fractured jaw and other dental complaints and issues when he became aware of them during Leyva's incarceration at the Hill Correctional Center and during Dr. Estaver's tenure there. At no time did Dr. Estaver consciously decline to see Leyva, order or prescribe specific treatment or medication in an effort to harm or other cause him any health complications. (Estaver Dec., ¶51).
79. Dr. Shute provided Leyva with medical care and treatment for his mandible fracture and other medical needs when he became aware of them during Leyva's incarceration at the Hill Correctional Center and during Dr. Shute's tenure there. At no time did Dr. Shute consciously decline to see Leyva, order or prescribe specific treatment or medication in an effort to harm or other cause him any health complications. (Shute Dec., ¶33).
80. After Leyva's transfer to Pinckneyville, he was treated by Dr. Jon Gardner, a dentist at Pinckneyville Correctional Center. (Plaintiff's dental records, attached hereto as Exhibit 5).
81. On March 10, 2009, Dr. Gardner checked all of Leyva's lower teeth and found that they were not loose. Pain medication was provided. (Ex. 5).
82. Leyva was later sent on medical furlough to an oral surgeon, Dr. Swanson, for evaluation. Dr. Swanson recommended the removal of all hardware in Leyva's mandible. (Ex. 5).
83. On May 6, 2009, Leyva was sent on a medical furlough for surgery to have the hardware removed from his mandible by Dr. Swanson. (Leyva Dep., pgs. 34 – 35); (Ex. 5).
84. On June 8, 2009, Dr. Gardner extracted tooth #27. (Ex. 5).
85. Leyva continues to receive care and treatment from Dr. Gardner. (Leyva Dep., pg. 38); (Ex. 5).

Discussion and Conclusion

The court finds the Defendants were not deliberately indifferent to Plaintiff's serious medical needs. Deliberate indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), citing *Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). Prison officials violate the Eighth Amendment proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The injury or need must be objectively serious, *and* the official must personally know of the risk and consciously disregard it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v. Fairman*, 120 F.3d 88. 91 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593 (2001). An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373.

In order to prove his claims, the Plaintiff must prove deliberate indifference to a serious medical need. At a minimum, this requires actual knowledge of impending harm which is easily preventable so that a conscious, capable refusal to prevent harm can be inferred from the defendants' failure to prevent it. *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997); *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To establish deliberate indifference, Plaintiff must show the Defendants ignored a known risk. *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998).

Additionally, in order to establish deliberate indifference, Plaintiff must show that the Defendants must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and they must actually draw the inference. *Higgins v. Correctional Medical Services*, 178 F.3d 508, 511 (7th Cir. 1999); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995). The exercise by a physician of his professional judgment does not constitute deliberate indifference. *Youngberg v. Romeo*, 457 U.S. 307, 322-323 (1982). Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. Additionally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). It should also be kept in mind that inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need. *Sellers v. Henman*, 41 F.3d 1100, 1102-03 (7th Cir. 1994).

A prisoner has the right to medical care, but he does not have the right to determine the type and scope of the medical care he personally desires. The Eighth Amendment does not require that prisoners receive "unqualified access to healthcare." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *see also, Hernandez v. Keane*, 341 F.3d 137 (2d Cir. 2003). Rather, inmates are entitled only to "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). "A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. Detella*, 95 F.3d 586, 592 (7th Cir. 1996). A difference of opinion between a physician and the patient does not give rise to a constitutional right, nor does it state a cause of action under Section 1983. Disagreement with a doctor's treatment decisions cannot be the basis for an Eighth

10

Amendment challenge. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). *See also, Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006). The Eighth Amendment does not provide that an inmate is entitled to demand specific care, nor does it entitle him to the best care available. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Although a prisoner has the right to receive medical care, he does not have the right to determine the type and scope of care he personally desires. *Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968), *citing Lawrence v. Ragen*, 323 F.2d 410, 412 (7th Cir. 1963). Inattention to a medical condition amounts to a constitutional violation only where the medical condition is serious. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991).

As previously indicated, deliberate indifference may only be found when an official knows of and disregards an excessive risk to inmate health or safety. *See Duane v. Lane*, 959 F.2d 673, 676 (7th Cir. 1992). Deliberate indifference also requires that Defendants either intended to harm Plaintiff or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to provide medical care. *See Smith-Bey v. Hospital Administrator*, 841 F.2d 751, 759 (7th Cir. 1988).

In order to state a cognizable claim against a prison official, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle*, 429 U.S. at 104. Deliberate indifference requires the prison official to act with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) *quoting Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Therefore, a prison official cannot be liable under the Eighth Amendment "unless he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. Further, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

A prison official must reasonably respond to a prisoner's complaints, through the investigation and referral of a plaintiff's complaints, in order to be insulated from liability. *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006). In addition, "[i]f a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that this prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218 (3rd Cir. 2004). "Prison administrators, having no medical expertise, must rely on health care professionals to assess the needs of prisoners and initiate treatment." *Williams v. Cearlock,* 993 F. Supp. 1992, 1997 (C.D. Ill. 1998) (holding inmate's claim, under § 1983, that prison provided defective medical care, did not extend to warden and assistant warden, who did not have direct responsibility for medical care). "A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to provide a gratuitous rescue service." *Burks v. Raemisch,* 555 F.3d 592, 596 (7th Cir. 2009). Accordingly, a non-medical prison official, including a Health Care Unit Administrator, is entitled to summary judgment on a claim of deliberate indifference when he or she reasonably responds to an inmate's complaint or grievance by ensuring the inmate has been evaluated by a physician and received medical

care for the complained of condition. *Johnson v. Doughty*, 433 F.3d 1001, 1010-1012 (7th Cir. 2006); *see also Bond v. Aguinaldo,* 228 F. Supp 2d 918, 920 (N.D. Ill. 2002) ("Because deliberate indifference requires actual knowledge of a serious risk of harm, [plaintiff] may not sue the non-medical personnel who denied his grievances. Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.").

In this case, Plaintiff claims that Defendants were deliberately indifferent to the injuries he sustained from assault by another inmate. However, Plaintiff's own deposition testimony proves otherwise, as he received care from numerous doctors and nurses both at the prison and at outside hospitals. Specifically, Plaintiff's jaw was fractured during an assault by another inmate on January 5, 2008 at Hill Correctional Center. After the assault, Plaintiff was provided immediate care by a nurse and taken to the health care unit. When Plaintiff arrived at the health care unit he was attended to by the nurses and then transferred to the Galesburg Cottage Hospital. At the outside hospital, Plaintiff was seen by an ER doctor, given X-rays and stayed the night. Casper, a private physician who deals with dentistry and the jawbone area performed surgery the next day. Plaintiff's jaw was wired shut by the surgeon. After surgery, Dr. Casper cleared Plaintiff to return to prison, he was transported back to Hill Correctional Center and placed in the infirmary to recuperate. Plaintiff remained in the infirmary for 12 weeks. While in the infirmary, Plaintiff was seen by a nurse daily, by Dr. Shute three times and by the dentist Dr. Estaver more than three times. When Plaintiff's jaw was wired shut, he had complaints about the wires poking his gums. Dr. Estaver gave Plaintiff wax to stick on to the edge that was poking his mouth. Further, more than two or three times wires broke because of brushing and Plaintiff was taken to an outside hospital to see Dr. Bobocheck or Dr. Casper. The wires were removed from Plaintiff's jaw by an outside doctor after his 12 week stay in the infirmary. Further, Plaintiff had a second surgery on his jaw by Dr. Swanson.

The record demonstrates that Plaintiff was under the constant care of medical experts who were providing him treatment for his fractured jaw. Not only did Plaintiff get immediate treatment after the assault, but he was sent to an outside hospital the same night. At the hospital Plaintiff received surgery from a doctor specializing in the jaw area. Further, when Plaintiff arrived back at Hill Correctional Center, he spent 12 weeks in the health care unit recovering, where he had constant access to medical care. In fact, Plaintiff admits he was able to see a nurse every day. Further, Plaintiff had a second follow up surgery by an outside doctor. What more Plaintiff could want is unclear, but regardless, he is not entitled to demand specific treatment. It is
unfortunate that Plaintiff had to endure the recovery process after his assault, but there is no evidence that there has been any deliberate indifference to his injuries. Plaintiff's claim against each Defendants is without merit.

Plaintiff's claim against Defendant Mathes, a nurse and the prison health care unit administrator, is that she did not direct the dentist, the doctors and the nurses to provide him certain treatment while he was in the health care unit for 12 weeks during 2008. Plaintiff is not entitled to demand specific care. Further, there is no evidence that Defendant Mathes, a nurse,

could direct the doctor or dentist to provide any specific treatment. Moreover, there is no evidence that Plaintiff in fact needed any other treatment, as he was getting continuous treatment while in the health care unit. Plaintiff's claim against Defendant Warden Acevedo, in regards to his medical care, is that he did not properly supervise the health care unit and that he did not come visit Plaintiff or show enough compassion after his injury. Plaintiff included Defendant Martinez in this suit because he failed to protect Plaintiff from the inmate who assaulted him. Plaintiff does not proceed on a claim of failure to protect (see 5/13/09 merit review order) and he never asked Defendant Martinez for medical care. Tammy Bennett is a part of this lawsuit because she failed to protect Plaintiff from assault by an inmate. As already stated Plaintiff is not proceeding on a failure to protect claim. When Plaintiff made a medical complaint to Defendant Bennett, she ensured that he had access to the health care unit. Plaintiff wrote grievances to defendant Grievance Counselor Johnston complaining about his medical care and he is suing her because she did not ensure that he had appropriate pain medication or medical care. All Plaintiff's grievances to Defendant Johnston started during his stay in the infirmary. Plaintiff's claim against Defendant Goodman is that he asked him to see the health care unit to get pain medication and Defendant Goodman told him to make a request to the health care unit. Plaintiff's claim against Defendant Mowen is that before the assault by another inmate he told Plaintiff to suffer it out and while Plaintiff was in the health care unit Plaintiff made a complaint to Defendant Mowen about his medical treatment, to which Defendant Mowen did nothing. Defendant Mauey told him contact the placement office about a cell change prior to an inmate assaulting him. Plaintiff's claim against Dr. Shute and Dr. Estaver is that they were deliberately indifferent to his serious medical needs.

The above allegations against each separate Defendant do not state causes of action for deliberate indifference. Plaintiff was under the care of medical experts and Defendants were entitled to rely on those experts to provide Plaintiff with medical care. There is no evidence that any Defendant was deliberately indifferent. It is unclear what more Plaintiff wanted done for his broken jaw. However, what is clear is that Defendants could not have been deliberately indifferent because Plaintiff was receiving extensive care from medical experts. Accordingly, Defendants are entitled to summary judgment.

It is therefore ordered:

1. Pursuant to Fed. R. Civ. Pro. Rule 12(b)(6), Defendants' summary judgment motions [81] and [83] are granted. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56. The case is terminated. Any remaining matters are rendered moot. The parties are to bear their own costs.
2. If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).

Enter this 28th day of March 2011.

                                           /s/ Michael M. Mihm
                              _____
                                               Michael M. Mihm
                                Senior United States District Court Judge